Filed 1/4/22  Monterroso v. Hydraulics International CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| ARON MONTERROSO,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>HYDRAULICS INTERNATIONAL INC.,<br><br>    Defendant and Appellant. | B299946, B302722, B302723<br><br>(Los Angeles County Super. Ct. No. BC654053) |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge.  Affirmed in part and reversed in part (B299946); affirmed (B302722, B302723).

Troutman Pepper Hamilton Sanders, Jeffrey M. Goldman and Misha Tseytlin for Defendant and Appellant Hydraulics International, Inc.

Alexander Morrison + Fehr, Tracy L. Fehr, J. Bernard Alexander, III; Law Offices of Hugo E. Gamez and Hugo E. Gamez for Plaintiff and Appellant Aron Monterroso.

Aron Monterroso sued his former employer, Hydraulics International, Inc. (Hydraulics), based on allegations that the company fired him for taking leave to care for his mother after she suffered a stroke. After the court granted Hydraulics's motion summarily adjudicating several of Monterroso's claims and his request for punitive damages, Monterroso prevailed at trial on two causes of action: one based on the California Family Rights Act (the CFRA) (Gov. Code, § 12945.2 & Cal. Code Regs., tit. 2, § 7297.7),[1] and one based on Hydraulics's alleged failure to engage in the interactive process required under the Fair Employment and Housing Act (the FEHA) (§ 12900 et seq.). The jury awarded Monterroso economic and emotional distress damages. The court awarded Monterroso attorney fees in an amount close to the lodestar amount Monterroso had calculated, but denied Monterroso's request for twice the loadstar amount.

In two consolidated appeals, each party appeals from the judgment and from the order awarding attorney fees. In the appeal from the judgment, Hydraulics challenges the verdicts against it on both claims as well as the amount of the damages award. Monterroso contends that the court erred in summarily adjudicating his punitive damages claim and several other causes of action. In the appeal from the order on attorney fees, Hydraulics challenges the amount awarded as unsupported by the evidence, whereas Monterroso challenges it based on the court's refusal to employ a multiplier.

We conclude that even if Hydraulics is correct that substantial evidence does not support a finding that Monterroso

---

[1] Unless otherwise indicated, all statutory references are to the Government Code.

was told he was fired during his leave, and/or even if Monterroso's testimony to this effect was false, the record still contains substantial evidence to support the jury's verdict in Monterroso's favor on his CFRA claim. As to the jury's verdict on the FEHA claim, we conclude Hydraulics cannot be held liable for a failure to engage in the interactive process with Monterroso based on his mother's disability, because the FEHA does not authorize an interactive process claim based on such associational disability. Our holding in this regard does not require retrial or recalculation of damages, however, because Monterroso claimed the same harm under his CFRA and FEHA theories of liability.

We further conclude that none of the challenged aspects of the damages award or the court's summary adjudication of the punitive damages claim provides a basis for reversal or other relief on appeal.

Finally, we affirm the attorney fees award because the court did not abuse its discretion.

## FACTS AND PROCEEDINGS BELOW

### A. *Factual Background*

The following factual background is based on the evidence presented at trial.

#### 1. *Hydraulics and Monterroso*

Hydraulics develops, manufactures, and supports a variety of systems used by the United States military. Hydraulics has strict attendance policies for its employees, pursuant to which an employee who is absent from work for three consecutive days without notifying a supervisor is considered to have abandoned his employment as of the morning of the third day.

Hydraulics employed Monterroso from August 1986 to March 2010, and from May 2010 to January 2016. For most of that time, Monterroso worked as a lead assembler in the component assembly department. For the majority of Monterroso's employment at Hydraulics, his supervisor was Milton Gaitan. After Gaitan was promoted to manager of the assembly department, Manuel Gutierrez became Monterroso's direct supervisor. Gutierrez reported to Gaitan.

### 2. *Monterroso's leave to care for his mother*

After work on Friday, December 4, 2015, Monterroso learned that his mother, who lives in Guatemala, had suffered a stroke. He called Gaitan and asked for leave so he could go to Guatemala to arrange care for his mother, a request that Gaitan approved. Monterroso went to work the next day, but obtained Gutierrez's permission to leave early because he was upset about his mother.

Monterroso's sister purchased Monterroso a nonrefundable round-trip flight scheduled to depart Los Angeles on December 7, 2015 and return on Friday, January 8, 2016. Monterroso testified that, on December 7, 2015, before departing for Guatemala, Monterroso telephoned Gutierrez to confirm the specific dates he would be in Guatemala, and that he would return to work on Monday, January 11. Gutierrez testified that Monterroso may have told him the dates for Monterroso's leave during such a call, but that he could not recall what those specific dates were. Gutierrez also testified that he may have relayed any dates he did learn to Juanita Porras, a Hydraulics payroll administrator who also assisted with certain personnel matters (including leave requests), but he could not recall. Porras testified that Gutierrez informed her Monterroso was to return to work on Monday,

4

January 4 (not Monday, January 11). Gutierrez could not recall whether he did this.

In any event, it was undisputed at trial that Monterroso left Los Angeles for Guatemala on Monday, December 7, 2015 and returned to Los Angeles on Friday, January 8, 2016, but did not appear at Hydraulics until Tuesday, January 19, 2016.

### 3. *Conflicting evidence regarding when Hydraulics terminated Monterroso*

At trial, the parties presented conflicting evidence regarding when Hydraulics terminated Monterroso. Because this is an issue central to certain of Hydraulics's arguments on appeal, we summarize this evidence in detail below.

Hydraulics contends the evidence shows that it decided to terminate Monterroso on January 13, 2016, and communicated this to him on January 19, 2016. Monterroso contends that, on January 7, 2016, Hydraulics made the decision to terminate him, and that the company communicated this to him during a Saturday, January 9, 2016 phone call.

#### a. *Evidence regarding January 9, 2016 phone call*

At trial, Monterroso testified that he spoke with Gutierrez by phone on Saturday, January 9, 2016, and that, during the call, Gutierrez told Monterroso he had been terminated. Monterroso testified that he had initiated the call "as a courtesy" to let the company know that he was back in Los Angeles and would be returning to work the following Monday, January 11, as planned. Monterroso testified that, in response to being told he was fired, he asked only whether he could pick up his check, and was told he could do so "any day."

5

Monterroso was cross-examined about documents Hydraulics characterized as containing his prior inconsistent statements regarding his termination date. Specifically, Monterroso was asked to explain why, in his verified response to an interrogatory asking for all facts supporting that Hydraulics decided to terminate him on January 7, Monterroso did not refer to the January 9 telephone call, and instead indicated that "[o]n January 19th, 2016, [Monterroso] met with . . . Gaitan at defendant's premises, and . . . Gaitan presented [Monterroso] with the termination letter/personnel action notice indicating" a January 7 decision to terminate him. Monterroso was also cross-examined regarding his verified Department of Fair Employment and Housing (DFEH) complaint, which alleged that, after Monterroso returned from Guatemala, Hydraulics had asked him to report for work on January 19, and had informed Monterroso on that date that he was terminated. In response to these questions, Monterroso reiterated that he was telling the truth about the January 9 phone call. He acknowledged he had understood both documents, and signed the interrogatory responses under penalty of perjury, but maintained he did not write them.

Gutierrez testified that he did not tell Monterroso on January 9 that Monterroso had been terminated. Gutierrez's phone records from that day were admitted into evidence and do not show any incoming calls from either of Monterroso's phone numbers, although they do reflect a call from a blocked number.

b. *January 13, 2016 documents and events*

On Wednesday, January 13—four days after the alleged phone call with Gutierrez —Monterroso texted Gutierrez, stating that he had provided Gutierrez with a doctor's note certifying his mother's illness and that Monterroso would "only be able to arrive

6

on Monday [presumably, January 18]. I'm fixing some problems I have." The text message does not mention Monterroso having been terminated.

Porras testified that, also on January 13, 2016, Gaitan decided to terminate Monterroso based on Monterroso not having reported to work for three consecutive days since his leave ended, in violation of company policies and requirements. Porras testified that, on January 13, she prepared a personnel action notice, or "PAN form," dated January 13, 2016, which indicated: "Granted time off for family emergency, on Dec[ember] 21, employee called would return on [Monday,] Jan[uary] 4th as of this date no show, no call. Per Handbook employees with 3 days no show no call considered job abandonment."

The January 13, 2016 PAN form does not identify a specific termination date (rather, it refers only to Monterroso's leave ending Monday, January 4, and deems Monterroso to have abandoned his job as of three days following that date). Other documents Porras prepared that day, however, contain an express January 7 termination date. Namely, in a form provided to Hydraulics's 401(k) plan administrator, Porras indicated that Monterroso was terminated on January 7, 2016. And a January 13, 2016 email from Porras to a Hydraulics human resources employee, with a copy to Gaitan, reads: "[Monterroso's] last day worked was Dec[ember] 5th left due [to] a medical emergency with his mother. Since then he has contacted Hydraulics on Dec[ember] 21[st] when he indicated he would be back by Jan[uary] 4th, he did not return and we have not heard from him. The decision has been made to consider this job abandonment (Balman agrees). Effective date of termination January 7th since this is 3 days no show no call from the date he was expected to return."

c.     *January 19, 2016 events*

It is undisputed that, after his time in Guatemala, Monterroso did not return to Hydraulics until Tuesday, January 19, 2016.[2]  On that day, Monterroso tried to "punch in with his card"— meaning the "card where [Hydraulics] clock[s] in the time that [employees] enter"— while wearing his uniform.  Monterroso testified that Gaitan informed Monterroso that morning he was to sign a termination letter, and that Monterroso, Gaitan, and Porras then signed the PAN form dated January 13, 2016.  On this day, Monterroso also received his final paycheck and bonus check.

### 4.     *Evidence regarding Monterroso's emotional and mental state after being terminated*

At trial, the jury heard lay and expert testimony regarding Monterroso's mental state after Hydraulics terminated him.

Monterroso testified that he was not "upset" when he learned that he lost his job, but rather "felt bad because [he] said how is it possible after working 29 years."  Monterroso later testified that it "upset [him] to lose [his] job" "[b]ecause . . . [he] wasn't going to be able to continue to help [his] mother," that he "was losing sleep[,] . . . had depression" and "would wake up at night suddenly

---

[2] In his testimony at trial, Monterroso was vague as to what he was doing during the approximately 10 days between January 9, 2016 (when, according to his testimony, he learned he was fired) and January 19 (when he returned to Hydraulics). He acknowledged, however, that from Thursday, January 14 through Sunday, January 17, 2016, he was in Chicago visiting the woman who is now his wife, and that he had booked this ticket several months before taking leave.  The record does not suggest Monterroso requested these days off work or informed Hydraulics that he would be unable to work on these days.

like when you're scared." He further testified that he had difficulty sleeping because he "kept thinking about work and how [he] would be able to resolve the problems that were coming to [him]." He testified that for approximately seven months after his termination, he rarely left his room. He "kept thinking of how bad Hydraulics had done by [him] since [he] had given them 29 years of [his] life" and he had been terminated when he "needed [his job] the most." He "felt humiliated," "ashamed," and "bad." He noticed changes in his own personality and behavior, such as hiding from his sister and walking slowly while looking downward. Monterroso's sister and brother-in-law testified that they noticed some of these changes in Monterroso after his termination as well.

Monterroso's psychological expert, Dr. Ines Monguio, diagnosed Monterroso with moderate clinical depression (major depressive disorder), chronic adjustment disorder with anxiety, and somatization disorder (somatic symptom disorder).[3] Monguio testified that these conditions were caused by Monterroso losing his job of 30 years, a job from which he had derived pride and a sense of purpose, for reasons he perceived to be unfair. "[T]he loss of the job was the proximate, largest, most important cause [of Monterroso's depression,] made worse by the failure to be able to fulfill his obligations" as a son, because he could not help pay for his mother's care after her stroke. Monguio testified that Monterroso suffered from numerous physical symptoms in connection with the emotional

---

[3] Monguio interviewed Monterroso for four hours and administered psychological tests, including the Structured Inventory of Malingering Symptomatology, the Milan Clinical Inventory, Multiaxial Inventory, and the Minnesota Multiphasic Inventory.

9

effects of his termination, including tension headaches, neck and shoulder pain, gastrointestinal problems and lack of appetite.

Monguio opined that Monterroso's depression prognosis was "fair to poor" and that he would always be vulnerable to depression. She recommended weekly treatment with a Spanish-fluent psychologist for six months to a year, and every two weeks for "a while," thereafter.

Hydraulics did not offer any expert testimony to rebut Monguio's opinions.

### 5. *Evidence regarding Monterroso's efforts to find new employment*

Monterroso testified that he attempted to find employment after he was terminated at Hydraulics. According to Monterroso, he looked for work with friends and in the Spanish newspaper *La Opinion*, and filled out a form on the EDD website, noting his work experience, but did not hear back. At some point after his termination, Monterroso moved to Chicago to live with his now wife, and unsuccessfully applied for work there as well.

Monterroso testified that his depression interfered with his ability to seek work. He further testified that he did not have the formal education and did not know which companies had assembly jobs comparable to his duties at Hydraulics. Ultimately, Monterroso's wife suggested he clean homes with her, which he did, making $200 per week with no benefits.

### B. *Monterroso's Lawsuit and Proceedings Below*

Monterroso sued Hydraulics with a complaint alleging causes of action under the FEHA for age discrimination, disability discrimination, failure to accommodate, failure to engage in the interactive process, failure to prevent discrimination, and retaliation. The complaint also alleged causes of action for

10

wrongful discharge, violation of the CFRA, violation of Business and Professions Code section 17200, and intentional infliction of emotional distress.  Monterroso sought damages for past and future economic losses, as well as emotional distress and punitive damages.

### 1. *Summary adjudication and jury verdict*

Hydraulics successfully moved for summary adjudication of Monterroso's request for punitive damages, as well as on five of Monterroso's causes of action.  Monterroso's CFRA, FEHA disability discrimination, and FEHA interactive process claims proceeded to a jury trial.[4]

The jury returned a verdict rejecting Monterroso's FEHA disability discrimination claim, but found in Monterroso's favor on his CFRA and FEHA interactive process claims.  Using a special verdict form, the jury more specifically found as to Monterroso's CFRA claim that Hydraulics had "[d]ischarge[d] . . . Monterroso while he was on family care leave" (capitalization omitted) and "[r]efused to return him to his job when his family care leave ended," and that his "request for family care leave was a substantial motivating reason for his discharge."  As to his interactive process claim, the jury specifically found that Monterroso had "request[ed] that Hydraulics . . . make a reasonable accommodation to care for his mother and return to his job," but that Hydraulics "fail[ed] to participate in a timely, good-faith interactive process with . . . Monterroso to determine whether reasonable accommodation could be made."  (Capitalization omitted.)

---

[4] Monterroso elected not to proceed with his age discrimination and wrongful termination claims.

11

The jury awarded plaintiff $1,292,063 in compensatory damages. The award consisted of $184,291 in past lost earnings; $284,772 in future lost earnings; $23,000 in "[f]uture expenses: (mental)"; $550,000 in past noneconomic damages; and $250,000 in future noneconomic damages.

The economic damages amounts are consistent with the testimony offered by Dr. Tamorah Hunt, Monterroso's economic expert. Hydraulics did not offer any expert testimony regarding damages. Hunt calculated plaintiff's past lost earnings at $194,951, using Monterroso's regular pay of $19.07 per hour, and increasing the hourly rate by 2.25 percent per year in 2017 and 2018, based on Monterroso's historical increases. The jury awarded the amount Hunt calculated for Monterroso's lost earnings, less approximately $10,000. Using the same approach, Hunt calculated Monterroso's future loss of earnings at $284,772, the exact amount the jury awarded.

### 2. *Appeal and cross-appeal from judgment (case No. B299946)*

In a single motion, Hydraulics sought a new trial on the CFRA claim, a new trial or judgment notwithstanding the verdict (JNOV) on the FEHA interactive process claim, and a new trial or conditional remittitur on the damages award.[5]

---

[5] On appeal, Monterroso argues that Hydraulics's motion was not timely under Code of Civil Procedure section 659, because Hydraulics did not file its supporting memorandum and evidence within the requisite statutory timeframe. Monterroso confuses the timeframes applicable to supporting papers (governed by Code Civ. Proc., § 659a) and the time frame applicable to the notice of motion (governed by Code Civ. Proc., § 659, subd. (a)). (See Code Civ. Proc., § 629.) Code of Civil Procedure section 659a requires that "[w]ithin

The trial court denied Hydraulics's motion.  Hydraulics appealed the denial, and Monterroso cross-appealed, challenging certain of the court's summary adjudication rulings.

### 3.  *Appeal and cross-appeal from attorney fees award (case Nos. B302722 & B302723)*

Monterroso filed a motion for attorney fees, requesting a lodestar amount of $692,616, plus a 2.0 multiplier.  The trial court awarded Monterroso $625,000 in attorney fees and denied Monterroso's request for a multiplier.  Hydraulics timely appealed from the attorney fees award, challenging the amount of the award as excessive.  Monterroso cross-appealed, challenging the trial court's denial of a multiplier.  This court consolidated the appeals in case Nos. B299946, B302722, and B302723 for purposes of briefing, oral argument and decision.

---

10 days of filing [a] notice [of intent] . . . the moving party shall serve upon all other parties and file any brief and accompanying documents, including affidavits in support of the motion." Hydraulics's supporting papers and evidence complied with these deadlines.

## DISCUSSION

### I.    Appeal from Judgment (Case No. B299946)

In its appeal from the judgment below, Hydraulics argues this court should (1) remand for a new trial on the CFRA claim, because the trial court abused its discretion in denying Hydraulics's motion for a new trial, despite Monterroso offering what Hydraulics characterizes as false testimony on a crucial point, and because substantial evidence does not support the CFRA verdict; (2) reverse the judgment on Monterroso's interactive process claim, because association with a disabled individual is not a legally cognizable basis for such a claim; and, alternatively, (3) reduce the jury's damages award, which Hydraulics argues is so grossly disproportionate that it must be the product of passion and prejudice.

Monterroso's cross-appeal from the judgment argues that the trial court erred in various ways in granting Hydraulics's summary adjudication motion regarding Monterroso's failure to prevent discrimination, retaliation, and reasonable accommodation claims. He also argues the court erred in summarily adjudicating Monterroso's punitive damages request, because Hydraulics did not meet its burden of producing evidence that none of the persons involved in the decision to terminate him were managing agents or that Hydraulics did not act with the requisite malice.

We address each of these arguments in turn below.

### A.    *CFRA Claim*

Hydraulics argues that substantial evidence does not support the jury's verdict on the CFRA claim, because the jury's special finding that Monterroso was terminated while on CFRA leave "was almost certainly a result of false testimony" regarding the

14

January 9 phone call, and that no reasonable jury could have found the testimony credible. Hydraulics challenges the court's denial of his motion for a new trial on essentially the same basis, contending the court abused its discretion by "fail[ing] to exercise its power and duty to act 'as a thirteenth juror.'"

The CFRA "is intended to give employees an opportunity to take leave from work for certain personal or family medical reasons without jeopardizing job security." (*Nelson v. United Technologies* (1999) 74 Cal.App.4th 597, 606.) In general, the CFRA makes it an unlawful employment practice for an employer of 50 or more persons to refuse to grant an employee's request to take family care and medical leave, up to a certain amount of time. (§ 12945.2, subds. (a) & (b)(2)(A); see generally *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1253–1254 (*Avila*).) The CFRA also requires that an employer not take any adverse action against the employee because he or she took family care leave. (See § 12945.2, subd. (k)(1) ["[i]t shall be an unlawful employment practice for an employer to . . . discharge . . . any individual because of . . . [¶] . . . [a]n individual's exercise of the right to family care and medical leave"].) Here, it is undisputed that Hydraulics approved, and Monterroso took, CFRA leave, so his CFRA claim is based on Hydraulics's "retaliation [against him] for taking CFRA leave"—specifically, terminating him because he took leave.

In challenging the CFRA verdict, Hydraulics argues that Monterroso falsely testified that Gutierrez told him during a January 9 phone call that he was fired, that no other evidence supports that Monterroso was fired on or before that day, and that the record is otherwise inconsistent with such a phone call. More specifically, Hydraulics argues that Monterroso's testimony was inconsistent with allegations in his complaint and his DFEH filing that he was terminated on January 19, the latter of which

15

he verified under penalty of perjury. Hydraulics further argues Monterroso's testimony is also inconsistent with his not mentioning the call in his interrogatory responses listing the evidentiary bases for his contention that the company decided to terminate him on January 7, as well as with his attempt on January 19 to "punch in" at Hydraulics while wearing his uniform. Monterroso was cross-examined about these inconsistencies, and the jury ultimately found him credible despite them. We must defer to the jury's evaluation of the credibility of witnesses unless the testimony was inherently implausible in light of the entire record. (See *People v. Jones* (1990) 51 Cal.3d 294, 314 ["[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."]; accord, *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).)

In any event, even if, as Hydraulics argues, Monterroso falsely testified about the January 9 phone call, Monterroso still presented substantial evidence to support the jury's CFRA verdict. Hydraulics's argument to the contrary assumes that Monterroso being informed he was terminated during the January 9 phone call was necessary to the jury reaching its verdict on the CFRA claim. Neither the law nor the special verdict form supports this assumption.

The special verdict form's special finding that Monterroso was terminated while on leave was not necessary to the jury's verdict on the CFRA claim. That form allowed the jury to find for Monterroso on the CFRA claim on one or more of the following bases: that Hydraulics "[r]efuse[d] to give him family care leave," "[d]ischarge[d] [him] while he was on family care leave," *or*

16

"[r]efuse[d] to return him to his job when his family care leave ended." The jury found *both* that Hydraulics terminated Monterroso while he was on leave *and* that it had refused to return him to his job following leave. Given the structure of the special verdict form, either finding alone was sufficient to allow the jury to continue and answer the questions that followed—namely, to determine whether Monterroso's leave was "a substantial motivating reason" for his termination, whether Monterroso was harmed as a result of his discharge, and whether Hydraulics's conduct was a "substantial factor in causing" that harm. The jury answered all of these questions in the affirmative. On appeal, Hydraulics does not challenge the sufficiency of the evidence to support the finding that Hydraulics "[r]efuse[d] to return him to his job when his family care leave ended." Even if Hydraulics is correct that Monterroso falsely testified regarding the January 9 phone call, this would not change or undermine the evidence that Hydraulics did not permit Monterroso to return to work after his leave was over.

Finally, to the extent Hydraulics's argument can be construed as a challenge to the sufficiency of the evidence to support that Monterroso's leave was "a substantial motivating reason" for his discharge, we likewise disagree. As reflected in the special verdict form, Monterroso only had the burden of proving that "[he] suffered . . . termination . . . , because of [his] exercise of [his] right to CFRA leave." (*Avila, supra*, 165 Cal.App.4th at p. 1254; see *Dudley v. Department of Transportation* (2001) 90 Cal.App.4th 255, 261 ["the elements of a cause of action for retaliation in violation of CFRA . . . are . . . (1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave; (3) the plaintiff exercised her right to take leave for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse

17

employment action, such as termination . . . because of her exercise of her right to CFRA leave"].) Such retaliatory causation can be established by an employer "counting CFRA leave as absences under a no-fault attendance policy." (*Avila, supra*, 165 Cal.App.4th at p. 1254.) The jury was presented with Hydraulics documents reflecting that Hydraulics decided to terminate Monterroso for failure to report to work while he was still on CFRA leave (from January 4 to January 7). That this evidence may be contradicted or undermined by other evidence in the record is not dispositive when reviewing the verdict for substantial evidence. (See *Estate of Leslie* (1984) 37 Cal.3d 186, 201 [in reviewing for substantial evidence, all conflicts in the evidence should be resolved in favor of the respondent]; *Marriage of Mix* (1975) 14 Cal.3d 604, 614 [testimony of a single witness, including the plaintiff, can constitute substantial evidence]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 889 (*Shade Food*) [" '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury' "].) The jury was entitled to reject Hydraulics's characterization of these documents as reflecting an innocent misunderstanding about the timing of Monterroso's leave.

Hydraulics argues that, because these documents were all *executed* on January 13, regardless of the dates they contain, they actually constitute evidence that the company terminated Monterroso on January 13 after he failed to report for work following his leave. But these documents expressly identify January 7 as the effective date of Monterroso's termination. A jury theoretically could have chosen to interpret these January 7 references as typographical errors and to instead deduce a termination date from them based on the date they were executed.

But that is not the only possible interpretation of these documents. And Hydraulics points to no documents in the record containing a January 13 termination date. The only other evidence in the record supporting a January 13 termination date is the testimony of Porras—the author of the very documents her testimony contradicts.

Although we acknowledge that the record contains evidence that could reasonably support Hydraulics's version of events, our view of the strength of that evidence and the weakness of Monterroso's credibility is not the issue. Rather, the question is whether the record contains substantial evidence supporting the verdict. The answer to that question is that the record does.

## B.    *FEHA Interactive Process Claim*

Monterroso prevailed at trial on his interactive process claim on the theory that the FEHA permits such a claim to be based not just on an employee's own physical disability, but on an employee's association with someone who has a physical disability—here, Monterroso's mother after she suffered a stroke. We will refer to such a theory as one of "associational disability." As discussed below, however, unlike the list of protected characteristics used in some sections of the FEHA—a list the FEHA expressly defines as including associational disability—the FEHA does not include associational disability in the definition of any of the language used in the reasonable accommodation and interactive process sections.

The FEHA contains two companion requirements related to an employer's duty to provide reasonable accommodation for a disabled employee. Section 12940, subdivision (m), first obligates employers "to make reasonable accommodations for the known physical or mental disability of an applicant or employee." To assure that the burden is not placed on the employee to alone

19

identify what reasonable accommodations might be required, section 12940, subdivision (n), further requires an employer "to engage in a timely, good faith, interactive process with [an] employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition." Neither section expands the concepts of physical disability, mental disability, or known medical condition to include associational disability. Nor do the general FEHA definitions of "[p]hysical disability," known "medical condition" or "[m]ental disability" contain any mention of associational disability. (§12926, subds. (i), (j) & (m).)

Monterroso argues that we should nevertheless read associational disability into the definition of "physical disability" employed in the interactive process section. To support this argument, he relies on section 12926, subdivision (o), with which the Legislature expressly incorporated the concept of associational disability into *other* FEHA language—language that does not appear in the sections governing either interactive process or reasonable accommodation claims, but instead appears in sections addressing FEHA discrimination and harassment claims.

Monterroso is correct that section 12926, subdivision (o) includes associational disability in its list of so-called protected characteristics, based on which the FEHA prohibits an employer from, for example, discriminating or harassing an employee: " '[r]ace, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, age, sexual orientation, or veteran or military status.' " (§ 12926, subd. (o).) Specifically, section 12926, subdivision (o) clarifies that this list "includes a perception that the person has any of those characteristics or that the person is

20

associated with a person who has, or is perceived to have, any of those characteristics." (*Ibid.*) Thus, section 12926, subdivision (o) incorporates associational disability into only instances where the FEHA employs its list of protected characteristics; for example, into the code sections governing disability discrimination. (See § 12940, subds. (a)−(d) & (j)(1).)

"When ' " ' "a statute on a particular subject omits a particular provision, the inclusion of such a provision in another statute concerning a related matter indicates an intent that the provision is not applicable to the statute from which it was omitted." ' " ' [Citations.]" (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 850.) Thus, the statutory scheme as a whole reflects a conscious decision by the Legislature *not* to impose reasonable accommodation or interactive process obligations on an employer based on an employee's association with a disabled individual.

Our interpretation of the FEHA provisions governing interactive process claims is consistent with the legislative history of section 12926, subdivision (o). When the Legislature added section 12926, subdivision (o) to the FEHA and thereby expanded the list of protected characteristics to include associational disability, it did so in a bill seeking to expand the scope of FEHA's protections against *discrimination* specifically. An analysis by the Assembly Judiciary Committee staff describes the bill as "clarif[ying] that FEHA's protections against housing and employment *discrimination* cover associational rights as well, i.e., *discrimination* based upon perceptions about who one may be associating with will now be protected under the Act." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1670 (1999−2000 Reg. Sess.) May 11, 1999, p. 15, italics added.) The "key issue" raised by the bill was whether "various civil rights statutes [should] be amended to strengthen *discrimination* protections or clarify

ambiguities in the law" and describes the bill as "[c]larif[ying] that protections against housing and employment *discrimination* cover . . . the right to freely associate." (*Id.* at p. 1, italics added; see also *id.* at p. 15.) Further, a goal of the legislation was to harmonize "particular provisions of state *discrimination* laws" with "federal . . . employment laws in these areas" in order "to facilitate the 'vigorous enforcement' of our anti-*discrimination* laws." (*Id.* at p. 4, italics added.) Under federal law, associational disability does not trigger an interactive process obligation. (See, e.g., *Erdman v. Nationwide Ins. Co.* (3d Cir. 2009) 582 F.3d 500, 510 ["[a]lthough refusal to 'mak[e] reasonable accommodations' may constitute illegal discrimination against a disabled employee [citation], the plain language of the [Americans with Disabilities Act of 1990 (ADA)] indicates that the accommodation requirement does not extend to relatives of the disabled" (italics omitted)]; *Larimer v. International Business Machines* (7th Cir. 2004) 370 F.3d 698, 700 ["the right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person"].)

Such federal authority supports our interpretation of the FEHA. "Where . . . the particular provision in question in the FEHA is similar to the one in the ADA, the courts have looked to decisions and regulations interpreting the ADA to guide construction and application of the FEHA." (*Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 973, fn. 12; accord, *Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 165.) The FEHA and ADA contain virtually identical language governing interactive process and reasonable accommodation claims. (Compare § 12940, subd. (m)(1) [requiring employers "to make reasonable accommodation for the known physical or mental disability of an applicant or employee"] with 42 U.S.C. § 12112,

22

subd. (b)(5)(A) [requiring employers to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee"].) California courts have thus looked to persuasive federal authority analyzing ADA interactive process claims when analyzing FEHA interactive process issues. (See, e.g., *Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 979–980.) Such persuasive federal authority supports our holding that the FEHA does not include an interactive process claim based on associational disability.

In sum, statutory language that neither appears in nor applies to the code sections governing interactive process claims (or those governing reasonable accommodation claims), and that was added to the FEHA for the purpose of expanding discrimination laws, does not permit us to expand the FEHA's interactive process protections to include associational disability.[6] Nor do we see any other basis in the statutory language for interpreting the FEHA

---

[6] Monterroso cites language in *Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, suggesting that the FEHA "may reasonably be interpreted to require accommodation based on the employee's association with a physically disabled person." (*Id.* at p. 1039.) *Castro-Ramirez,* however, was a FEHA discrimination case, and the court's comment regarding associational disability reasonable accommodation claims is at most dicta for the proposition urged by Monterroso. (See *id.* at pp. 1038–1039.) The court in *Castro-Ramirez* itself noted: "[W]e do not decide this point. We only observe that the accommodation issue is not settled and that it appears significantly intertwined with the statutory prohibition against disability discrimination." (*Id.* at p. 1039.) In any event, we disagree that section 12926 can provide a basis for expanding the scope of interactive process or reasonable accommodation claims for the reasons discussed herein.

as requiring an interactive process based on an employee's known associational disability. Accordingly, we reverse the judgment on Monterroso's associational disability interactive process claim, as it is not a cognizable claim under the FEHA.

### C. *Summary Adjudication of Monterroso's FEHA Reasonable Accommodation, Failure to Prevent Discrimination, and Retaliation Causes of Action*

#### 1. *Reasonable accommodation cause of action*

Monterroso challenges the court's summary adjudication of his reasonable accommodation claim. As discussed above, however, the FEHA does not recognize a reasonable accommodation claim based on associational disability for the same reasons it does not recognize an interactive process claim based on associational disability. (See Discussion, part I.B, *ante*.) Thus, even though this was not the basis for the trial court's ruling, the court properly granted Hydraulics's motion for summary adjudication of this claim. (See *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1481 ["where there is no genuine issue of material fact, the appellate court should affirm the judgment of the trial court if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court"].)

#### 2. *Retaliation cause of action*

Monterroso next challenges the summary adjudication of his FEHA retaliation claim. A FEHA retaliation claim is based on section 12940, subdivision (h), which declares it unlawful for "any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) In order to prevail on such a claim, Monterroso must

24

prove that Hydraulics took some adverse employment action against him because he "opposed any practices forbidden under [the FEHA] . . . or . . . filed a complaint, testified, or assisted in any proceeding under this part." (*Ibid.*; see *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987–988 [FEHA retaliation "plaintiff must show that the motive [for employer's actions] was retaliatory animus"].) The record before the court at the summary judgment stage plainly established Monterroso did not file his complaint or otherwise oppose the actions he claims violated the FEHA until after Hydraulics had already terminated him. Hydraulics could not have fired Monterroso in retaliation for actions Monterroso had not yet taken. The court thus properly summarily adjudicated Monterroso's FEHA retaliation claim.

### 3. *Failure to prevent discrimination cause of action*

Finally, Monterroso challenges the summary adjudication of his failure to prevent discrimination claim. (See § 12940, subd. (k) [unlawful for employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring"].) Unlike interactive process or reasonable accommodation claims, FEHA discrimination and failure to prevent discrimination claims *can* be based on associational disability, because the code sections providing for them include the phrase section 12926, subdivision (o) defines as including associational disability. (See Discussion, part I.B, *ante*.)

Monterroso's failure to prevent cause of action suffers from another fatal deficiency, however. Namely, actionable discrimination or harassment is a necessary element of a failure to prevent claim (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1317–1318; *id.* at p. 1317 ["[i]t would be

anomalous to provide a remedy for failure to prevent acts that are not 'unlawful' under the FEHA"]), and Monterroso does not challenge the jury's conclusion that he did not suffer actionable discrimination. Of course, the jury had not made this finding at the time the court summarily adjudicated Monterroso's failure to prevent discrimination claim. Nevertheless, given that Monterroso implicitly concedes that the jury negated a necessary element of his failure to prevent discrimination claim, any error in the trial court's summary adjudication of that claim cannot have prejudiced Monterroso. We must therefore affirm the challenged ruling and need not consider whether the trial court erred, as such error would not be reversible in any event. (*Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853–854 ["A miscarriage of justice should be declared only when the reviewing court is convinced after an examination of the entire case, including the evidence, that it is reasonably probable a result more favorable to the appellant would have been reached absent the error. [Citations.] Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant."])

### D. *Our Holding Regarding the Judgment Does Not Require A New Trial on Damages*

The verdict form did not require the jury to indicate whether the damages the jury awarded were attributable to Monterroso's CFRA claim, his interactive process claim, or both. Thus, Hydraulics argues that, if we conclude (as we do above) that liability is proper on only one of these bases, we should remand for further proceedings to determine damages based solely on the one remaining claim. We disagree.

As a preliminary matter, "[c]ourts have held . . . that a defendant who fails to request a special verdict segregating the elements of damages forfeits the right to challenge a separate

element of damages on appeal." (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053 (*Gillan*).)

More importantly, the CFRA and interactive process claims are based on the exact same actions and allege the exact same harm. The relevant damages evidence is thus the same regardless which legal theory of liability prevails. In arguing to the contrary, Hydraulics cites *Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, in which the reviewing court "agree[d] with the trial court's conclusion that it is impossible to separate 'what damages may have been awarded for the discrimination alone from what noneconomic damages were awarded that included a constructive discharge'—that is, damages for plaintiff's distress arising from 'the effect and consequences of that discharge,' an event 'of a very different character than a voluntary resignation.'" (*Id.* at p. 1278.) But here, the CFRA and the interactive process claims both assert Monterroso's termination and resulting emotional and economic harm as the basis for and measure of damages. *Simers* is thus inapposite. The other case on which Hydraulics relies for this point, *Gillan, supra*, 147 Cal.App.4th 1033, is likewise distinguishable. In that case, the plaintiff was entitled to damages only for his false arrest and not for any subsequent conduct, yet significant evidence and argument regarding damages arising from the subsequent conduct was presented at trial. (*Id.* at pp. 1052–1053.) Here, the jury did not hear any evidence of damages from conduct that was only part of the basis for Monterroso's FEHA claim, as opposed to his CFRA claim, because Monterroso claimed the same injury and damages under both theories of recovery.

**E.** *Compensatory Damages Award*

Hydraulics next challenges the amount of the jury's economic and noneconomic damages awards, arguing that they are excessive and that substantial evidence does not support them. We will reverse a damages award as excessive only when "the entire record, when viewed most favorably to the judgment, indicates [the damages award] [was] rendered as the result of passion and prejudice on the part of the jurors." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 (*Bertero*); *Don v. Cruz* (1982) 131 Cal.App.3d 695, 707 ["[w]here the evidence relates to the amount of damages . . . a damage award is not supported by substantial evidence if it is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice"].) In assessing whether this is the case, "[a] court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations." (*Don v. Cruz, supra*, at p. 707.)

Hydraulics relies solely on the amount of the damages award in relation to the evidence Monterroso presented at trial as an indicator that the award must be the product of passion and prejudice. Monterroso offered testimony of a damages expert to support the amount of his economic damages award, as well as testimony of a psychological expert that he suffered a "tremendous[] trauma[]" and depression as a result of his termination. Monterroso testified consistent with the unchallenged psychological expert opinion that he felt depressed and ashamed as a result of being terminated, the way he was terminated, and his difficulty supporting his mother financially as a result of his termination.

28

### 1.    *Emotional distress damages*

Hydraulics does not challenge the reliability of the psychological expert's opinions, nor did Hydraulics offer contrary expert testimony on the subject.  Rather, Hydraulics criticizes Monterroso's testimony about his emotional state after he lost his job, arguing the testimony is internally inconsistent.  Hydraulics also suggests that the distress Monterroso suffered may have been caused, not by his termination, but rather by his mother's illness and/or other stressors in his life, a theory Monterroso's expert expressly disagreed with.  To the extent Hydraulics asks us to usurp the role of the jury and reach a different conclusion than the jury did regarding the credibility of Monterroso and his expert, we may not do so.  (*Ochoa, supra*, 6 Cal.4th at p. 1206; *Shade Foods, supra*, 78 Cal.App.4th at p. 889.)  To the extent Hydraulics argues this evidence, even if credible, is insufficient to support the award amount, we disagree.  A reasonable jury could have concluded that the uncontradicted testimony presented was sufficient to support the noneconomic damages award.  (See *Bertero, supra*, 13 Cal.3d at pp. 64–65 ["[i]n view of the testimony elicited by Bertero on the issue of damages and considering the defendants' complete failure to attempt in any way to rebut such testimony, we conclude that . . . the compensatory damage award is not excessive" (fn. omitted)].)

Hydraulics also argues that the emotional distress award is disproportionate to the injury suffered because it is several times the amount of Monterroso's annual salary while working at Hydraulics.  But Hydraulics cites no authority for the proposition that a plaintiff's emotional distress resulting from loss of work should be measured by the amount of income the plaintiff lost.  Rather, "[t]he fixing of [emotional distress] damages has long been vested in the sound discretion of the trier of fact [citation] subject

29

only to the passion and prejudice standard [citation]." (*Bertero, supra*, 13 Cal.3d at p. 64.) On the current record, we cannot say that the award amount is so high that it is necessarily the product of passion or prejudice.

## 2. *Economic damages award*

In challenging the economic damages amount, Hydraulics argues that the law does not permit Monterroso to recover for damages he could have easily avoided by making reasonable efforts to seek comparable new employment, and that the evidence does not reflect Monterroso made such efforts to mitigate his damages. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043.) But Monterroso testified that he sought alternative employment after Hydraulics terminated him. That Hydraulics views Monterroso's efforts to find new employment as insufficient, or his testimony on this point as "vague[ ]" does not mean a jury could not conclude otherwise. Moreover, "[t]he defendant bears the burden of pleading and proving a defense based on the avoidable consequences doctrine" and a failure to mitigate. (*Id.* at p. 1044.) Hydraulics offered no evidence to support its claim that Monterroso could have obtained better employment, or could have obtained employment sooner.

Hydraulics's challenge to the compensatory damages award is without merit.

## F. *Summary Adjudication of Punitive Damages*

Monterroso argues the court erred in granting Hydraulics's motion for summary adjudication on his request for punitive damages.

A plaintiff may not recover punitive damages unless "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294,

30

subd. (a) [addressing punitive damages "for the breach of an obligation not arising from contract"].)  In addition, a corporation will only be liable for punitive damages based on acts ratified, authorized, or committed by a corporate officer, director, or managing agent.  (Civ. Code, § 3294, subd. (b); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1151.)  Thus, in order to prevail on its summary judgment motion regarding punitive damages, Hydraulics needed to establish below that, drawing all reasonable inferences in favor of Monterroso, the undisputed facts prevented Monterroso from establishing at least one of these two elements.  (See Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)  Moreover, under the burden-shifting framework applicable to summary judgment motions, Hydraulics needed to "present evidence, and not simply point out that [Monterroso] does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar*, *supra*, at p. 854, fn. omitted.)

Monterroso argues that Hydraulics failed to identify undisputed facts establishing that no Hydraulics "managing agent" acted with the requisite malice, that the undisputed facts do not prevent a triable issue of fact on these issues, and that the trial court erred in concluding otherwise.  In an appeal challenging a summary adjudication ruling, " 'we exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law."  [Citation.]  "The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later.  [Citation.]  Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve

31

doubts about the propriety of granting the motion in favor of the party opposing it." ' " (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 365 (*Davis*).)

To prove an employee is a managing agent, "a plaintiff seeking punitive damages . . . [must] show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 577 (*White*).) Put differently, managing agents are "only those corporate employees who exercise substantial independent authority and judgment in their corporate decision[-]making so that their decisions ultimately determine corporate policy." (*Id.* at pp. 566–567.)

Monterroso correctly notes that the only evidence Hydraulics offered regarding the relevant employees' ability to shape corporate policy are the declarations of Porras and Gaitan. Gaitan's declaration provides that Gaitan was an assembly manager with "two supervisors under [his] purview," under whom were approximately 11 leads. Porras's declaration indicated she was a payroll administrator whose duties included "dealing with payroll, processing employee leave requests, and maintaining employee personnel files." Both declarations also include the following language: "I am not involved in Hydraulics'[s] corporate decision-making, or in shaping the corporate policy of Hydraulics. I am not, and have never been an officer, director, or managing agent of Hydraulics."

Monterroso argues this isn't enough to satisfy Hydraulics's initial burden under the *Aguilar* burden-shifting framework, and that Monterroso's motion thus necessarily fails. In this regard, Hydraulics relies primarily on *Davis*, *supra*, 220 Cal.App.4th 358. In that case, the defendant sought to summarily adjudicate the plaintiff's punitive damages request based solely on a declaration

32

of the relevant employee providing that the employee " '[had] never drafted corporate policy or had substantial discretionary authority over decisions that ultimately determine [the company's] corporate policy. The only role that [the employee] play[ed] with respect to [the company's] anti-harassment and [Equal Employment Opportunity (EEO)] policies is to ensure that [the employees] are followed on the job." (*Id.* at p. 369, italics omitted.) The court concluded that this "statement was insufficient to satisfy [defendant's] initial burden of production to make a prima facie showing that [the employee] was not its managing agent" (*ibid.*) because it "state[d] a legal conclusion by simply parroting the *White* standard" (*ibid.*) and "did not contain a sufficient description of his job duties and responsibilities and the nature and extent of his authority and discretion . . . as well as his exercise of that authority and discretion." (*Id.* at pp. 369–370.) Monterroso argues that Hydraulics failed to meet its initial burden in the same way the moving defendant in *Davis* did, and that its motion must therefore fail.

Even if Monterroso is correct, however, this was not the only evidence before the trial court at the summary adjudication hearing, because Monterroso offered evidence in opposition as well. We must base our analysis on this entire body of evidence presented to the trial court—not just the declarations offered by Hydraulics. To do otherwise would be to sacrifice the broader goal of summary adjudication motions—" 'avoid[ing] a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device"—in the name of a burden-shifting framework that exists solely to facilitate that goal. (*Aguilar, supra*, 25 Cal.4th at p. 855 [summary judgment procedures "may be reduced to, and justified by, a single proposition: If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue

33

of material fact to a trier of fact for determination, then he should prevail on summary judgment"].)

The universe of undisputed facts presented to the court below in hearing Hydraulics's punitive damages motion includes information that distinguishes it from *Davis*—namely, deposition testimony establishing the relevant employees' job duties and discretion, based on which no reasonable jury could conclude that either was a managing agent of Hydraulics. Monterroso's statement of undisputed facts and supporting evidence reflects that Gaitan was responsible for managing and supervising 72 employees, including 11 leads; had the authority to decide to terminate employees; was responsible for forecasting productivity for top management; and oversaw the department that builds and manufactures important components ordered by the Navy and Army. Monterroso also presented evidence that Porras independently ran payroll for 395 employees, independently issued discipline to employees, and issued written warnings without verbal warnings.

Given this evidence, a jury could not reasonably conclude that Gaitan or Porras meets the definition of "managing agent" set forth in the case law. (*White*, *supra*, 21 Cal.4th at p. 566.) None of the job duties reflected in the evidence suggests Porras or Gaitan made decisions that shaped corporate policies—that is, "formal policies that affect a substantial portion of the company and that are [of] the type likely to come to the attention of corporate leadership." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 715.) The fact that an employee has a supervisory position with the power to terminate employees under his or her control—even one in which he supervises a large number of employees—does not, by itself, support such a conclusion. (*White, supra*, 21 Cal.4th at pp. 566, 576–577; *Muniz v. United Parcel Service, Inc.* (N.D.Cal. 2010)

731 F.Supp.2d 961, 976–977 [fact that operations manager was " 'in charge of 6 divisions, 23 package centers and approximately 40 managers, 150 supervisors and 4,200 employees' " insufficient to raise triable issue whether he was managing agent, absent evidence that he set corporate policy].) Given the duties reflected in the deposition testimony Monterroso offered, a jury simply could not conclude that either Porras or Gaitan had "ultimate supervisory and decisional authority" to the extent necessary to establish managing agent status. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 823 (*Egan*).)

In arguing to the contrary on appeal, Monterroso mischaracterizes the deposition testimony he offered below. Namely, Monterroso contends that this testimony establishes that Gaitan "could choose not [to] enforce the rules in the Employee Handbook" and that Porras "had the authority to deviate from company policies as she chose." But the evidence Monterroso characterizes in this way includes no indication that Gaitan had such authority. And Porras's testimony Monterroso cites merely includes a colloquy during which Porras indicated that, although the employee handbook provided employees should directly submit grievances about an adverse employment action directly to the human resources manager in writing, Porras and other human resources employees might, under certain circumstances, "get [an employee seeking such review] with somebody to talk to" if "it's something right there in the minute that we need to deal with." Finally, Monterroso presents as an undisputed fact that Porras "had the authority to review company policy and made additions to policy." But the deposition testimony cited for this claim reflects that Porras was among the human resources employees who would "review" the employee handbook draft prepared by attorneys to "make sure if there's anything that we'd like to see added," and

that she "[could] make a suggestion, but it[ ] [was] ultimately not [her] call."

Even if Porras and Gaitan had some limited authority—either officially or in practice—to deviate from procedures set forth in the employee handbook under certain circumstances, a reasonable jury could not infer from these facts any meaningful authority to shape "the general principles which guide [Hydraulics], or rules intended to be followed *consistently over time* in [Hydraulics] corporate operations." (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 167 (italics added) [so defining "corporate policy" in this context].) The ability to make the occasional exception to employee grievance procedures is hardly an ability to shape the general principles and rules "followed consistently over time" at the corporation (*ibid.*), and does not establish "substantial authority over decisions that set . . . *general principles and rules*." (*Id.* at p. 168, italics added.) Nor does the ability to make suggestions about the employee handbook that the company is not obligated to adopt.

In this respect, *Davis* is distinguishable from the instant matter. The undisputed facts in *Davis* indicated not only that one of the two relevant employees " 'had broad discretion relating to personnel issues and the allocation of resources to meet project goals' " but also discretion "to allow the use and possession of alcohol on the [jobsite] by [the company's] employees despite its written corporate policy prohibiting it" and "the authority and discretion to not initiate an investigation into the . . . [incident that formed the basis of the lawsuit] despite [the company's] written policy requiring an immediate investigation by a trained employee or third party investigator." (*Davis, supra*, 220 Cal.App.4th at pp. 367–368.) The other relevant employee in *Davis* was the company's "EEO officer and was responsible for

administering its policies for prevention of discrimination, retaliation, and harassment based on gender and other protected classes for its entire Northwest District, including California. . . . [A]ll onsite EEO officers were trained to send all concerns about policy violations to [him]," and he "conducted training and conducted or oversaw [the company's] investigations relating to alleged discrimination, retaliation, or harassment." (*Id.* at p. 368.) The undisputed facts here reveal no such far-reaching influence over the company's FEHA policies or broad discretion on key issues unrestricted by written corporate policy.

We acknowledge that, under certain circumstances, even if an employee does not have an official policy-shaping role, the employee's discretionary decisions can shape *de facto* corporate policy. (See *White, supra,* 21 Cal.4th at p. 580 (conc. opn. of Mosk, J.).) But no such circumstances are present here. In *White,* for example, the employee was a zone manager responsible for running virtually all aspects of eight stores that reflected a significant portion of the company's business. (*Id.* at p. 577.) Under these circumstances, the employee "exercised substantial discretionary authority over vital aspects of [the company's] business that included managing numerous stores on a daily basis and making significant decisions affecting both store and company policy." (*Ibid.*) As part of this, the employee routinely "exercised authority that 'necessarily result[ed] in the ad hoc formulation of policy' that adversely affected plaintiff. [Citation.] Specifically, she engaged in a local practice of retaliating against, by firing, an employee who testified at the unemployment hearing of another . . . employee." (*Id.* at p. 580 (conc. opn of Mosk, J.); *id.* at p. 577 ["[i]n firing [the plaintiff] for testifying at an unemployment hearing, [an employee] exercised substantial discretionary authority over decisions that ultimately determined corporate policy in a most

crucial aspect of [the company's] business"].)  This is nothing like Porras's and Gaitan's occasionally permitting a grievance to proceed verbally as opposed to in writing as required by the employee handbook.  Nor does the case law support Monterroso's contention that Gaitan firing *one* employee (Monterroso) "resulted in the ad hoc formulation of corporate policy" regarding CFRA leave.  Both Porras and Gaitan testified that their ability to make decisions regarding firing and employee discipline were guided and limited by written company policy.  There is no evidence suggesting either employee routinely deviated from those policies, nor any evidence that the manner in which they routinely exercised their limited discretion otherwise created unofficial Hydraulics corporate policy in any area.  (*Cf. Egan, supra*, 24 Cal.3d at p. 823 [because insurance company employees "dispose[d] of insureds' claims with little if any supervision, they possess[ed] sufficient discretion for the law to impute their actions concerning those claims to the corporation" and their actions "necessarily result[ed] in the ad hoc formulation of policy"].)

Thus, the evidence before the trial court at the summary judgment stage regarding the discretion and job duties of Porras and Gaitan did not raise any material question of fact as to whether either had an official or a de facto role in shaping corporate policy at Hydraulics.  The jury could not have found that they were managing agents whose actions could expose Hydraulics to punitive damages liability, and the trial court did not err in so concluding.

## II.  Appeal from Attorney Fees Order (Case Nos. B302722 & B302723)

In appeal Nos. B302722 and B302723, both parties challenge the amount of attorney fees the trial court awarded Monterroso. Under the lodestar method for calculating attorney fees established in *Serrano v. Priest* (1977) 20 Cal.3d 25 (*Serrano*), the court begins

by "careful[ly] compil[ing] . . . the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case." (*Id.* at p. 48.)  The court uses the resulting figure—the lodestar amount—as "a touchstone." (*Id.* at p. 49.)  The lodestar amount reflects "the basic fee for comparable legal services in the community" (*ibid.*), which the court may then increase or decrease based on various factors, including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award.  [Citation.]  The purpose of such adjustment is to fix a fee at the fair market value for the particular action." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).)

Hydraulics challenges the fee award amount on the basis that the lodestar amount Monterroso requested was excessive. Monterroso challenges the trial court's refusal to employ a multiplier to the requested lodestar amount.  Our review of these issues is for an abuse of discretion.  (See, e.g., *Greene v. Dillingham Construction N.A., Inc.* (2002) 101 Cal.App.4th 418, 422 [FEHA attorney fee award].)  Because "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his court,'" the trial court has substantial discretion in calculating the amount of attorney fees, and its decision in this regard " 'will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano, supra,* 20 Cal.3d at p. 49.)

### A. *Whether the Attorney Fee Award Was Excessive*

To support the calculation of his requested lodestar figure $692,616, Monterroso offered declarations from his attorneys describing what work they performed and why, the rates charged, and attesting to their rates having been previously approved by

courts on multiple occasions. Monterroso's supporting evidence also included declarations of comparable plaintiff-side attorneys in the employment law community attesting to courts having awarded them similar rates, evidence of rates received by defense-side employment attorneys, and contemporaneous billing records with descriptions of the work performed on Monterroso's case.[7] The court did not indicate what hour and rate amounts it utilized in arriving at the $625,000 fee amount it ultimately awarded. The record strongly suggests, however, that the court utilized the rate and number of hours provided by Monterroso, given how close the fee award was to the lodestar amount Monterroso calculated, and that the court indicated it did not apply a multiplier.

Hydraulics argues the hourly fees Monterroso used to calculate its fee request were excessive. Assuming the court used these rates in calculating the award amount, Hydraulics cites no evidence to support the conclusion that they are so excessive as to render that amount an abuse of discretion. In arguing to the contrary, Hydraulics relies on purported median hourly rates for Los Angeles area lawyers handling discrimination claims contained in a survey of which this court declined to take judicial notice.[8]

---

[7] Hydraulics did not include the compendium of evidence supporting Monterroso's fee request in the initial record filed on appeal. After Monterroso noted this in his respondent's brief, Hydraulics filed a supplemental appellant's appendix that included this evidence, as well as other documentation and briefing from the proceedings below, most of which Monterroso already had in his possession. Monterroso moved to strike the supplemental appendix. We deny the motion.

[8] Hydraulics requested the trial court take judicial notice of this document as well. The record does not contain the trial court's ruling. Because there would be no need for Hydraulics to ask

Hydraulics also relies on anecdotal references to the rates charged by its own attorneys on this case, as well as rates previously approved for Monterroso's attorneys in other cases, as reflected in unpublished cases of which we declined to take judicial notice. Particularly given the extensive evidence in the record attesting to the reasonableness of Monterroso's attorneys' rates—including evidence, properly within the record below and on appeal, that courts have approved similar rates for Monterroso's attorneys in other cases—Hydraulics has failed to meet its burden of establishing that use of these rates to calculate the fee award (assuming the court did so) constitutes an abuse of the court's broad discretion as " 'the best judge of the value of professional services rendered in his court.' " (*Serrano, supra,* 20 Cal.3d at p. 49.)

Hydraulics next challenges the amount of the fee award based on the number of hours included in Monterroso's fee request, which the trial court did not indicate it had reduced in calculating the award. Monterroso offered billing records and attorney declarations to support the reasonableness of the hours reflected in his lodestar calculation. Hydraulics's only criticism of this evidence as a basis for the fee award is that one attorney utilized block billing descriptions regarding his work opposing Hydraulics's motion for

this court to take judicial notice of the survey, had the trial court already done so, we assume the trial court declined to take judicial notice of this document as well. Even if this survey were part of the record on appeal, however, it would not change the outcome of our analysis, as the trial judge has broad discretion as to the value of attorney services rendered in her courtroom, and, as outlined above, Monterroso offered multiple types of evidence to support the reasonableness of the requested rates. Hydraulics offers no basis on which the court should have believed the proffered survey instead of the attorney declarations and evidence of previous awards.

41

summary judgment.  Where the circumstances of the case require the trial court to deduct from a fee request work the attorneys performed on certain claims, block billing may be insufficient to support the request. Hydraulics argues such apportionment was necessary here, and that the fee award was excessive, because the court did not reduce the award to account for hours Monterroso's attorneys spent opposing Hydraulics's successful summary adjudication motion.  We disagree.

A court may disallow fees on an unsuccessful claim if that claim is "distinct in all respects" from the successful claims (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 440 (*Hensley*); accord, *Harman v. City and County of San Francisco* (2007) 158 Cal.App.4th 407, 423−424), or " 'when a claimant achieves only limited success' " overall.  (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989 (*Chavez*).)  But a "fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." (*Hensley, supra*, 461 U.S. at p. 435; *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 430 (*Wysinger*) [same].)  " '[W]here a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.' "  (*Id.* at p. 431.)  Put differently, "fees are not reduced when a plaintiff prevails on only one of several factually related and closely intertwined claims." (*Chavez, supra*, 47 Cal.4th at p. 989.)

All of Monterroso's causes of action were based on the same conduct.  As in *Wysinger*, each cause of action was "based on . . . paragraphs of facts in [the plaintiff's] complaint, which [the plaintiff] alleged were common to all causes of action."  (*Wysinger, supra*, 157 Cal.App.4th at p. 431 [plaintiff prevailed on only two of eight causes of action but was still awarded full attorney fees].)

42

Indeed, "employment discrimination cases, by their very nature, involve several causes of action arising from the same set of facts." (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 486.)  Nor did Hydraulics's summary adjudication victories meaningfully limit Monterroso's ultimate success at trial.  To the contrary, Monterroso obtained what Hydraulics acknowledges was a substantial damages award, which Hydraulics thus can hardly characterize as "modest" success.  (*Chavez, supra*, 47 Cal.4th at p. 990; *id.* at pp. 989–990 [reducing attorney fee award where success was "modest at best"].)

The trial court thus did not err in declining to apportion fees between Monterroso's various causes of action, and did not award an amount of attorney fees that exceeded the scope of the court's discretion.

### B.      *Court's Denial of Requested Multiplier*

At the hearing on Monterroso's attorney fees request, Monterroso asked the court to increase its lodestar amount by a multiplier of two, based primarily on the complexity of the litigation and the contingent nature of the fee arrangement with Monterroso.  In response, the trial court acknowledged the risk an attorney takes on in a contingency fee arrangement, stating:  "I do note that you take . . . [cases] not on hourly fee.  And you put your well-being at risk when you step in to represent an individual such as you did."  The court further noted:  "I have to tell you, I am not, in this instance, a fan of [l]odestar.  But I am a fan of people getting reasonably compensated for their talent and their effort.  The court is well aware that but for a trial lawyer willing to step up and take a case like this, somebody like your client[ ] might not have had access to address their claims.  I get it.  What I think is reasonable might be different, but it is a substantial amount of money."

43

Without further discussion of its reasoning, the court denied Monterroso's request for a multiplier.

In determining whether to apply a multiplier to the lodestar based on contingent risk and difficulty, "[i]n effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum, supra*, 24 Cal.4th at p. 1132.) The framework thus does not require application of a multiplier any time there is a contingency fee involved; rather, such a multiplier is appropriate when the risk created by that fee "justif[ies]" adjustment of the lodestar amount. (*Ibid.*) As our state Supreme Court has explained, "the trial court is not required to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors" and in fact "should not consider these factors to the extent they are already encompassed within the lodestar." (*Id.* at p. 1138, italics omitted.) Thus, although the "contingent and deferred nature of the fee award in a . . . case with statutory attorney fees requires that the fee be adjusted *in some manner* to reflect . . . the fair market value of legal services provided," this "contingency adjustment may be made at the lodestar phase of the court's calculation *or* by applying a multiplier to the noncontingency lodestar calculation (but not both)." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 394–395, italics added.)

Monterroso argues that the trial court abused its discretion by denying the requested multiplier, because without it, Monterroso's attorneys will not be compensated for the risk they took on in accepting a contingency fee arrangement, and thus for the work they performed. (See *Ketchum, supra*, 24 Cal.4th at pp. 1122, 1138; *id.* at p. 1133 ["fee awards should be fully

44

compensatory" and full compensation can include compensation for risk of nonpayment].) But just because the court did not grant a multiplier does not mean the court failed to include in its fee award "a premium for the risk of nonpayment." (*Id.* at p. 1138.) The court did not identify which hourly rates it used to calculate the award, or how it chose those rates. The award thus could have been based on rates the court determined sufficiently compensated Monterroso's attorneys for the risk of nonpayment the court acknowledged existed. The trial court's failure to expressly so state is not error; a trial court "has no sua sponte duty to make specific factual findings explaining its calculation of [a] fee award." (*California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 754 (*Duffy*); *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 67 [no California law requiring "trial courts to explain their decisions on all motions for attorney fees and costs, or even requiring an express acknowledgment of the lodestar amount"].) When a trial court's ruling on attorney fees does not identify the manner in which it calculated the fee award, "it is incumbent on the party who is dissatisfied with the court's calculation of the number of allowable hours to request specific findings." (*Duffy, supra*, 200 Cal.App.3d at p. 755.) But Monterroso did not request that the trial court specify how it arrived at the $625,000 in fees. "California courts have stated a disinclination to review the amount of an award when specific findings were not requested." (*Ibid.*) To the contrary, "the appellate courts will infer all findings exist to support the trial court's determination." (*Id.* at p. 754.)

Accordingly, we infer that the court found the rates used in calculating the $625,000 fee amount incorporated a contingency fee adjustment. Monterroso has failed to make a showing suggesting otherwise, and has failed to establish an abuse of

discretion. (See *Ketchum, supra*, 24 Cal.4th at pp. 1140–1141 [although record did not indicate whether trial court had employed the lodestar method, appellant's claim that attorney fees award was wrongly calculated must be resolved against him, because appellant had failed to request and furnish an adequate record of the trial court's reasoning].)

## DISPOSITION

Accordingly, we reverse the judgment against Hydraulics to the extent it finds Hydraulics liable under the FEHA for a failure to engage in an interactive process with Monterroso. In all other respects, including specifically the damages amount awarded, we affirm the judgment. We affirm the order awarding attorney fees in all respects. The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

CHANEY, J.

CRANDALL, J.*

---

**\*** Judge of the San Luis Obispo Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.